IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
*Southern Division*

|  |  |  |
|---|---|---|
| **TORRES ADVANCED ENTERPRISE SOLUTIONS LLC,** | * | |
| Plaintiff, | * | |
| v. | * | Case No.: PWG-12-3679 |
| **MID-ATLANTIC PROFESSIONALS INC., t/a SSI** | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

This Memorandum Opinion addresses Plaintiff Torres Advanced Enterprise Solutions, LLC's ("Torres") Motion for Temporary Restraining Order, ECF No. 3; Defendant Mid-Atlantic Professionals, Inc.'s, t/a SSI ("SSI") Opposition to Plaintiff's Motion for a Temporary Restraining Order, ECF No. 11; and Plaintiff's Reply in Support of Plaintiff's Motion for Temporary Restraining Order, ECF No. 19. The Plaintiff's Motion is DENIED for the reasons specified on the record during the hearing held on January 15, 2013, the transcript of which is incorporated herein by reference.

I. **BACKGROUND**

Torres entered into a Subcontracting Agreement with SSI, the prime contractor, effective October 1, 2012, to provide linguistic services to the U.S. Department of State's Office of Diplomatic Security, American Embassy in Baghdad. ECF No. 3-2. The Subcontract Agreement is valued at $34 million for a base period of one year, followed by four year-long

option periods. ECF No. 3-2. Under this Subcontract Agreement, SSI would provide 51% of the linguistic services while Torres would provide 49% of the linguistic services, as well as all of the housing and life support services for the linguists. ECF No. 3-2. After creating this subcontractor relationship, Torres and SSI submitted a bid proposal to address the bid requirements laid out by the U.S. Department of State. ECF No. 11-11.

Torres intended to house the linguists in a compound it already occupied within the International Zone, as outlined in the Torres/SSI joint bid proposal to the U.S. Department of State. ECF No. 11-10. However, due to unexpected changes in requirements to occupy buildings in the International Zone imposed by the Government of Iraq, eviction notices were served on the Torres/SSI linguists on November 7 and 26, 2012. ECF No. 11-4. While Torres worked on a plan to become compliant with the Subcontract Agreement and meet the expectations of the U.S. Department of State, ECF No. 11-5, the eviction from the Torres compound forced SSI to move the linguists into Prosperity, the American Embassy in Baghdad's housing facility on November 27, 2012. ECF No. 11-6.

On December 10, 2012, Torres submitted a proposal to the U.S. Department of State to house the linguists in an area called Jedraya, in what is known as the "Kurdish Zone" or "Red Zone." ECF No. 11-7. However, the Bureau of Diplomatic Security at the U.S. Department of State informed SSI on December 10, 2012, that the proposal to house the linguists in the Red Zone was rejected at "unacceptable" due to serious safety and operational concerns that would put American citizens at "undue risks." ECF No. 11-12. The U.S. Department of State then requested an alternative solution. ECF No. 1-3. On December 11, 2012 Torres sent a comprehensive response to the U.S. Department of State, asking that the Red Zone proposal be reconsidered. ECF No. 1-4. It was around this time, although the exact date is in dispute, that

SSI entered into a Teaming Agreement with another company, IBS, for housing and life support services for the linguists. Def.'s Exs. 16, 17, 18. SSI characterizes the Teaming Agreement with IBS as a contingent arrangement necessary to prevent the U.S. Department of State from terminating the entire contract if Torres was unable to secure housing for the linguists in the International Zone. TRO Hr'g, Jan 15, 2013. Torres, however, characterizes the Teaming Agreement as an unjustified termination by SSI of Torres' subcontract obligations to provide housing for the linguists. *Id.*

On December 14th, 2012, Torres filed this lawsuit claiming breach of the Subcontract Agreement by SSI. Pl.'s Compl, ECF No. 1. On the same day, Torres also filed a Motion for a Temporary Restraining Order under Fed. R. Civ. P. 65, seeking "an order (1) enjoining SSI from teaming up with any other company for the purposes of performing the services covered by the Subcontract agreement; and (2) to prevent SSI from taking any further action that is not consistent with the terms of the Subcontract Agreement." ECF No. 3.

On December 17th, SSI issued a cure notice to Torres for the housing and life services portion of the Subcontract Agreement. ECF No. 11-9. The U.S. Department of State responded to Torres' December 12, 2012 reconsideration request on December 19, 2012, rejecting for a second time Torres' housing proposal due to safety concerns. ECF No. 11-13.

On December 27, 2012, Torres responded to SSI's cure notice, accusing SSI of having a pretext to break the contract in order to get rid of Torres as the subcontractor, requesting a withdrawal of the cure notice, and informing SSI of a new housing proposal. ECF No. 19-2. This new proposal, which SSI sent on to the U.S. Department of State for approval, outlined a two-phase solution where the linguists first would be kept at Prosperity in the short term, then moved to long-term housing in the International Zone, which would be ready "in approximately

one month." ECF No. 19-2. This proposal was rejected by the U.S. Department of State on January 9, 2013, as the additional time the linguists would have to be housed in Prosperity, as well as the lack of pricing in the proposal, was found to be unacceptable. ECF No. 22-1, Ex. C. As housing the linguists at Prosperity adversely impacted their agreement to turn that compound over to the Government of Iraq, the U.S. Department of State informed SSI that they would start the termination process for the prime contract if they did not receive an acceptable solution to the housing situation within 24 hours. ECF No. 22-1, Ex. A. Later, on January 9, 2013, SSI sent a letter terminating the housing and life support services portion of the Subcontract Agreement with Torres, but not the portion of the subcontract allowing Torres to provide 49% of linguistic services. ECF No. 22-1, Ex. D.

## II. DISCUSSION

The purpose of a temporary restraining order ("TRO") or a preliminary injunction is to "protect the status quo and to prevent irreparable harm during the pendency of a lawsuit, ultimately to preserve the court's ability to render a meaningful judgment on the merits." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003). A preliminary injunction is distinguished from a TRO only by the difference in notice to the nonmoving party and by the duration of the injunction. *U.S. Dep't of Labor v. Wolf Run Mining Co.*, 452 F.3d 275, 281 n. 1 (4th Cir. 2006) (comparing Fed.R.Civ.P. 65(a) with Fed.R.Civ.P. 65(b)). The substantive standards for a TRO and a preliminary injunction are identical; therefore a district court can consider a motion for a TRO as a request for a preliminary injunction, so long as the opposing party was given notice sufficient to allow for a fair opportunity to oppose it. *Id.* at 283 (citing *Ciena Corp. v. Jarrard*, 203 F.3d 312, 319 (4th Cir. 2000)).

To obtain a TRO or a preliminary injunction, the plaintiff must "establish that [1] he is

likely to succeed on the merits, [2] he is likely to suffer irreparable harm in the absence of preliminary relief, [3] the balance of equities tips in his favor, and [4] an injunction is in the public interest." *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20, 129 S.Ct. 365, 374–76, 172 L.Ed.2d 249 (2008); see *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011). As a preliminary injunction is "an extraordinary remedy... [it] may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

Prior to 2009, the Fourth Circuit followed a "balance of hardship" approach to preliminary injunctions considering all four *Winter* factors, but "allowed[ing] each requirement to be conditionally redefined" in a "flexible interplay" depending on how the other requirements were met. *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 347 (4th Cir. 2009) (citing *Blackwelder Furniture Co. of Statesville v. Seilig Manufacturing Co.*, 550 F.2d 189, 196 (4th Cir.1977)). However, *Real Truth* invalidated this approach, and it "may no longer be applied" in the Fourth Circuit. *Id.* at 347. As a result, the plaintiff must satisfy each requirement as articulated. *Id.* at 347.

### A. Clear showing of the likelihood of success on the merits

To meet the first requirement, the plaintiff must "clearly demonstrate that he will *likely succeed* on the merits", rather than present a mere "grave or serious question for litigation." *Id.* at 346-347 (emphasis from the original). Only "providing sufficient factual allegations to meet the [Fed. R. Civ. P.] 12(b)(6) standard of *Twombly* and *Iqbal*" does not meet the rigorous standard required under the *Winter* and *Real Truth* decisions. *Allstate Ins. Co. v. Warns*, Civil Action No. CCB–11–1846, 2012 WL 681792, at *14 (D. Md. 2012).

Relevant to the present case is that post-*Real Truth* courts have "declined to issue a preliminary injunction when there are significant factual disputes" in breach of contract cases.

*Chattery Intern., Inc. v. JoLida, Inc.*, Civil Action No. WDQ–10–2236, 2011 WL 1230822 (D. Md. 2011) (citing *Allegra Network LLC v. Reeder*, No. 1:09–CV–912, 2009 WL 3734288, at *3 (E.D.Va. Nov. 4, 2009) (holding that the parties' conflicting versions of facts key to determining whether a breach of a franchise agreement occurred prevented the plaintiff from making a clear showing of the likelihood of success on the merits)).

In the present case, the record highlights multiple unresolved factual disputes. As the resolution of these disputes is central to the determination of a breach of contract claim, Plaintiff is prevented from making a clear showing of a likelihood of success on the merits. These disputes include, but are not limited to: [1] whether there was a contractual requirement for Torres to house the linguists in the International Zone, [2] whether SSI had a plan to terminate Torres before the U.S. Department of State threatened to terminate the prime contract, [3] whether the cure notice from SSI to Torres was properly invoked, [4] whether Torres violated the 30-day cool off period clause in the Subcontract Agreement when it filed this lawsuit, [5] whether SSI prematurely contracted with IBS in violation of the Subcontract agreement, and finally, [6] whether Torres' December 27th proposal for permanent housing is located in the International Zone or the Red Zone.

At this time the record is far from clear and the facts are continuing to develop, leaving robust factual disputes requiring subsequent discovery in order to get to the bottom of what is going on. Therefore, the court, based on the record before it, finds that the moving party has not established by clear evidence that they will succeed on the merits.

### B. Likelihood of irreparable harm in the absence of preliminary relief

Even when a plaintiff clearly demonstrates a likelihood of success on the merits, they still must show irreparable harm. *Real Truth*, 575 F.3d at 346. To analyze this element, the court

must determine whether [1] plaintiff is suffering actual and imminent harm, not just a mere possibility, and [2] whether that harm is truly irreparable, or whether it can be remedied at a later time with money damages. *See Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir.1991). *See also Sterling Commercial Credit—Mich., LLC v. Phoenix Indus. I, LLC*, 762 F. Supp 2d 8, 14–15 (D.D.C.2011) ("First, the injury must be both certain and great; it must be actual and not theoretical.... Second, the injury must be beyond remediation."). The Fourth Circuit finds that "irreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate." *Multi–Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994) (quoting *Danielson v. Local 275*, 479 F.2d 1033, 1037 (2nd Cir.1973)).

Plaintiff's relies on two cases to support their claim for irreparable harm. *Clark Pac. v. Krump Constr. Inc.*, 942 F. Supp. 1324 (D. Nev. 1996) (holding a TRO necessary to protect a subcontractor's "reputation in the industry and improve its job performance through valuable practical experience."); *Brennan Petroleum Prod. Co., Inc., v. Pasco Petroleum Co., Inc.*, 373 F. Supp. 1312 (D. Az. 1974), (finding a preliminary injunction was required to protect an ability to compete in the marketplace, and maintain goodwill). Pl.'s Reply Mot. 7, ECF No. 15.

Plaintiff's reliance on these cases is misplaced, as both apply the "balance of hardship" approach rejected by the Fourth Circuit in *Real Truth About Obama*, and not the stricter standard currently applied by this Court. 575 F.3d 342. Additionally, Plaintiff overlooks the fact-specific determinations that distinguish those cases from the speculative, generalized, or ascertainable harms in the present case.

In *Clark Pacific*, the irreparable harm determination was dependent upon the plaintiff's position as a new player in a highly technical building practice within the Nevada construction

industry, who "lost its chance to become a player in the… market for the foreseeable future" while increasing its expertise in a new and developing industry. 942 F. Supp. at 1347. Torres argues that they find themselves in a similar situation, where injunctive relief is necessary to prevent incalculable damage to their reputation and performance ratings, which could damage their ability to win new U.S. Department of State contracts in Iraq. Pl.'s Mot. for TRO 8.

However, unlike the contractor in *Clark Pacific*, Torres has significant contract experience in Iraq. Since 2005, Torres has been involved with 18 security projects, worked on the predecessor project to the linguist project currently at issue, and in November 2012, was awarded a prime contract to manage foreign military sales, all on Iraq. ECF No. 1-4. It is on the totality of Torres' track record in Iraq, where Torres is already a major market participant, that the U.S. Department of State will judge any future contract proposal, not in the vacuum of this situation alone. In addition, the record indicates that it is highly unlikely that there will be any other contracts available in Iraq for Torres to bid on in the future. TRO Hr'g, Dyer Test., Jan. 15, 2013.

Plaintiff also argues that they will suffer irreparable harm due to the loss of goodwill, which cannot be calculated monetarily. However, this Court takes judicial notice under Fed R. Evid. 201[1] that the Financial Accounting Standards Board[2] ("FASB"), an SEC-approved

---

[1] The Court "on its own" and "at any stage of the proceeding" may take judicial notice of "a fact that is not subject to reasonable dispute because it… can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201.

[2] According to its website, the FASB is:

> [T]he designated organization in the private sector for establishing standards of financial accounting that govern the preparation of financial reports by nongovernmental entities. Those standards are officially recognized as authoritative by the Securities and Exchange Commission (SEC) (Financial Reporting Release No. 1, Section 101, and reaffirmed in its April 2003 Policy Statement) and the American Institute of Certified Public Accountants (Rule 203, Rules of Professional Conduct, as amended May 1973 and May 1979).

organization designated to establish standards for financial accounting in the private sector, has a voluminous standard for dealing with goodwill in order to calculate its value on a balance sheet.[3] This ability to calculate money damages from the impairment of goodwill demonstrates an adequate remedy at law.

As the harms Plaintiff alleges are either speculative or the damages it claims ascertainable in monetary damages, the Court finds that Torres has not met its burden to clearly demonstrate irreparable harm.

### C. The public interest and the balancing of equities

When an injunction will "adversely affect a public interest... the court may... withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff." *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312–13, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982). In fact, "courts... should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* at 312.

Plaintiff relies on two cases for the abstract proposition that the "public has a strong interest in the enforcement of private contractual commitments." *Science Applications Int'l Corp. v. CACI-Athena, Inc.*, No. 1:08-CV-443, 2008 WL 2009377 (E.D. Va. 2008); *Naturalawn of Amer., Inc. v. West Group, LLC*, 484 F. Supp. 2d 392 (D. Md. 2007). Pl's Reply Mot. 8, ECF 15. Neither case relied upon by Plaintiff deals, however, with a contract to provide important life safety services to a government agency administering a program in the public interest. When a TRO or preliminary injunction will affect the ability of an agency to perform its public duties, the potential harm to this public interest "must be considered, though it may not be

---

Facts About FASB, http://www.fasb.org/jsp/FASB/Page/SectionPage&cid=1176154526495 (last visited Jan. 28, 2013).

[3] *Statement of Financial Accounting Standards No. 142: Goodwill and Other Intangible Assets*, Financial Accounting Standards Board (June 2001), http://www.fasb.org/pdf/fas142.pdf.

determinative." *Cerro Metal Products v. Marshall*, 620 F.2d 964, 972 (3rd Cir. 1980). Particularly, courts have found that specific and beneficial acts provided by Executive Branch government agencies or programs should not be halted by a preliminary injunction based on generalized ideas, as the public interest is found in "specific action, rather than in the vindication of an abstract principle" such as a general desire for contract enforcement. *Continental Group, Inc. v. Amoco Chemicals Corp.*, 614 F.2d 351, 357-58 (3rd Cir. 1980). See also *Delaware River Port Authority v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 924 (3d Cir. 1974) (holding that the Federal Maritime Commission's amicus brief, stating that a preliminary injunction would encroach on the agency's responsibility to regulate maritime practices and policies, directly led to a denial of the injunction).

In addition to the public interest determination, the balance of equities must tip in favor of the movant in order for a TRO or preliminary injunction to be granted. *Winter*, 555 U.S. at 20. Not only must courts weigh any potential harm to the nonmoving party, but also the chance of harm to any interested person, as well as any potential harm to the public. *Continental Group*, 614 F.2d at 356-357 (citing *Delaware River Port Authority v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 924 (3d Cir. 1974)). In cases where a preliminary injunction would prevent an agency from enforcing regulations that Congress found was in the public interest to direct an agency to develop and enforce, courts have found the balance of equities to tip in favor of denying the injunction to prevent harm to the agency's mission. *National Propane Gas Ass'n v. U.S. Dept. of Homeland Sec.*, 534 F. Supp. 2d 16 (D.D.C. 2008) (denying an injunction that would interfere with the Department of Homeland Security's ability to regulate security restrictions at propane facilities).

In the present case, the balance of equities and the public interest are interconnected.

Plaintiff's Counsel argues that the latest developments involving the most recent Torres proposal, as well as the joint proposal by SSI/IBS, have eliminated the safety concerns of the U.S. Department of State from the public interest calculation, therefore the general public interest of contract enforcement trumps any other public interest concerns. TRO Hr'g, Jan 15, 2013. However, to ask the Court to enter an order that may adversely affect the options available to the U.S. Department of State as it attempts to assure the security of its embassy personnel in a dangerous and volatile environment in favor of preserving the contract rights of a private litigant is an improper balancing of the equities, and is rejected by the Court. In light of this public interest, the Court finds that the balance of equities tips in favor of preventing harm to the mission of the U.S. Department of State.

### III.   CONCLUSION

After a careful review of the record as it currently exists, it is clear that Plaintiff has failed to meet its burden with regard to any of the four *Winter* factors, and injunctive relief is inappropriate. Therefore, for the reasons specified here and during the hearing on January 15, 2013, Plaintiff's Motion for Temporary Restraining Order is DENIED. A separate Order shall be issued concurrently with this Memorandum Opinion.

Dated: <u>January 28, 2013</u>                                             _____/s/_____
                                                                                            Paul W. Grimm
                                                                                            United States District Judge

bjb